IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------x
                                                      :
JOHN BOLTON, ET AL.                                   :        3:04 CV 670 (JBA)
                                                      :
v.                                                    :
                                                      :
                                                      :
CITY OF BRIDGEPORT, ET AL.                            :
                                                      :        DATE: FEBRUARY 7, 2006
------------------------------------------------------x
```

<u>RECOMMENDED RULING ON PLAINTIFFS' MOTION FOR [PRELIMINARY]
INJUNCTION TO PROHIBIT CITY OF BRIDGEPORT FROM HIRING OFF THE
EMPLOYMENT LIST AT ISSUE IN THIS LAWSUIT</u>

On April 22, 2004, plaintiffs John P. Bolton, Harold D. Hancock Jr., Dennis Rickard

Jr., Jeffrey Procaccini, Robert Procaccini, Sean Wanat, Alan Porzelt, Tom DanDrea,[1] Bret

Newport, Peter Donovan, James Demarest, Zygmunt Mysliwiec, Christopher Carroll, Thomas

Tarantino, Jarred Howe,[2] Jerry Rynich, Michael Corraro, John Simkins and Paul Devan III

initiated this action, on a <u>pro se</u> basis, against defendants City of Bridgeport, Mayor John

Fabrizi, Mayor Joseph Ganim, the City of Bridgeport Fire Department ["BFD"], Fire Chief

Michael A, Maglione, Provisional Fire Marshal Ronald Morales, Fire Inspector Ismael

Hernandez, City of Bridgeport Recruiters Captain Ronald Day and Lieutenant Ron Mackey,

Personnel Director John C. Colligan, Commissioners Leonor Guedes, Carmen Marcano,

Ralph Ford and Richard P. Rodgers, Charles M. Carroll, Lieutenant Craig Kelly, Captains

Charles Young and Luis Rivera, Inspector Lorenzo Pittman, Firefighters Venus Scudder,

Juan Hernandez and Johanna Georgia, the Hispanic Firefighter Association and Firebirds

Society of Bridgeport (Dkt. #1). An Amended Complaint was filed by counsel on August 30,

---

[1]Under the plaintiff's signature, the correct spelling is D'Andrea.

[2]Plaintiff Jarred Howe's Motion to Withdraw Claims (Dkt. #64) was granted by United States District Judge Janet Bond Arterton on December 21, 2005 (Dkt. #65).

2004 by plaintiffs Bolton, Corraro,[3] Dandrea,[4] Demarest, Devan, Donovan, Hancock, Howe,[5] Mysliwiec, Newport, Porzelt, Jeffrey and Robert Procaccini, Rickard, Rynich, Simkins, Tarantino, and Wanat, against defendant City of Bridgeport, Personnel Director Colligan, Commissioners Guedes, Marcano, Ford, and Rodgers, Fire Chief Maglione, and Mayors Fabrizi and Ganim.  (Dkt. #43).

In their Amended Complaint, plaintiffs allege a violation of their Fourteenth Amendment right to equal protection and due process of law by defendants' enforcement of a policy of reverse discrimination in which plaintiffs were denied employment as firefighters for the City of Bridgeport because of their race.  (Id.).  Defendants filed their answer and affirmative defenses on November 16, 2004.  (Dkt. #44).

On November 7, 2005, plaintiffs filed the pending Motion for [Preliminary] Injunction and brief in support (Dkts. ##55-56)[6] in which plaintiffs seek to enjoin the City of Bridgeport from hiring firefighters off of the employment list at issue in this lawsuit.  United States District Judge Janet Bond Arterton referred this motion to this Magistrate Judge on November 15, 2005 (Dkt. #59.  See also Dkts. ##60-61, 63, 66).  An evidentiary hearing was held on January 11 and 20, 2006.  (Dkts. ##66, 68-71, 74).[7]  Dr. James L. Outtz testified at the first

--------------------------------

[3]The correct spelling is Corraro, not Carraro.  (See Dkt. #1).

[4]See note 1 supra.

[5]See note 2 supra.

[6]Attached is a copy of Respondent City of Bridgeport Fire Department Response to Complaint and Schedule A submitted to the State of Connecticut Commission on Human Rights and Opportunities in Devan v. City of Bridgeport Fire Dept., dated May 27, 2004 (Exh. A); and the affidavit of Jeffrey M. Harris, sworn to November 7, 2005 (Exh. B).

[7]The hearing, originally scheduled for December 16, 2005, was canceled due to inclement weather, for which the courthouse was closed.

Under the latest scheduling order, filed on October 24, 2005, discovery was scheduled to close in this case on January 15, 2006 and all dispositive motions are due by February 15, 2006 (Dkt. #54).

day of hearing, and John C. Colligan, who retired as Bridgeport Personnel Director on June 28, 2004, testified at the final day of hearing.

On January 27, 2006, all parties filed their post-hearing briefs (Dkts. ##72-73).  For the reasons stated below, plaintiffs' Motion for [Preliminary] Injunction (Dkt. #55 ) is <u>denied</u>.

## I. FINDINGS OF FACT

According to the Civil Service Provisions of the Charter and Rules of the Civil Service Commission for the City of Bridgeport ["Bridgeport Regulations"](Exh. S), the City of Bridgeport's

> personnel director shall, from time to time, as conditions warrant, hold tests for the purpose of establishing employment lists for the various positions in the competitive division of the classified service.  Such tests shall be public, competitive and open to all persons who may be lawfully appointed to any position within the class for which examinations are held. . . .
>
> All tests shall be practical, and shall consist only of subjects which will fairly determine the capacity of the persons examined to perform the duties of the position to which appointment . . . is to be made, and may include tests of physical fitness or manual skill. . . . From the return and report of the examiners or from tests by him, the personnel director shall prepare a list of eligibles for each grade of the persons who shall attain such minimum mark as may be fixed for the various parts of such test, and whose general average standing upon the test for such position is not less than the minimum fixed by the rules of the commission, and who may lawfully be appointed.  Such persons shall rank upon the list in the order of their relative excellency as determined by the tests without reference to priority of time of tests.

(<u>Id.</u>, § 211(a), at 9-10).

During 2002, Personnel Director Colligan was made aware of an "urgent need" for firefighters in the City of Bridgeport.  On May 31, 2002, the City of Bridgeport Civil Service Commission provided a seven-page notice that it would hold an "open-competitive examination" for the position of Firefighter on September 14, 2002 and that all application forms were to be filed with the Commission by July 26, 2002.  (Exh. A, at 1).  The Notice further provided that an individual domiciled in the City of Bridgeport who received a passing

mark on the open competitive examination would have ten percent added to his or her passing grade in determining his or her order or rank on the eligibility list.  (Id.).[8]  The various prerequisites for the position were listed, including passing a qualifying medical examination and the elimination of anyone "who has been convicted of a felony, or is of bad moral character." (Id. at 2).  The Notice also indicated that those applicants who passed a qualifying written examination (75% of the highest score, rated on a scale of 100%) would be required to participate in a physical agility examination, and that those candidates who passed the physical agility examination would then take an oral examination; the oral examination would constitute one hundred percent of the applicant's score and would be used "to rank . . . applicants for selection."  (Id. at 3).[9]  The Notice included the eight exercises used for the physical agility examination, as well as the passing performance for each of these exercises. (Id. at 4-5).

Late in 2001, the City of Bridgeport first retained Dr. James L. Outtz, who holds an Ph.D in Industrial/Organizational Psychology and has impeccable credentials (Exh. 1), to develop the examination for the firefighter position, supervise the administration of the examination, and grade and analyze the results of the tests.  Dr. Outtz testified that his "principal contact" with the Bridgeport Civil Service Commission was Personnel Director Colligan.  Dr. Outtz had been retained by the BFD on three previous occasions in this capacity (including promotion procedures for the positions of Fire Lieutenant and

---

[8]Personnel Director Colligan testified that from his years in his position, he is aware that the City of Bridgeport has a significant minority population.

[9]Section 211(a) of the Bridgeport Regulations provides: "The markings of all tests shall be completed, the resulting employment lists and the answers to all questions in competitive written examinations posted as soon as possible thereafter and not later than ninety days from the date of the test." (Exh. S, at 10-11).  Personnel Director Colligan testified that he did not believe that such language only permitted the administration of written examinations and prohibited the administration of oral examinations.

Telecommunications Operator), commencing in February 2001, and had testified in March 2004 for the City in litigation filed by plaintiff Bolton in Connecticut State Court claiming racial discrimination against non-minority applicants for the position of firefighter[10] and in the summer of 1986 in federal court in Connecticut on the eligibility list for the written firefighter tests. (Id. at 21, 35, 36).  His résumé also reflects that Dr. Outtz has done significant consulting for the Bridgeport Police Department as well: in March 2000 to December 2001, he had been retained by the Bridgeport Civil Service Commission to "develop and validate promotion examinations for the positions of Police Sergeant and Police Detective," that he was retained by the Bridgeport Civil Service Commission in August 1986 through January 1987 to "develop and administer a content-valid procedure for the position of Police Lieutenant, including pre-test study materials, a written test, and work sample exercises," that he was retained by the Bridgeport Civil Service Commission in March 1985 through December 1985 to "develop and validate a written examination for the position of Police Officer," that he was retained by the Bridgeport Civil Service Commission from January 1984 through July 1985 to "develop and validate a promotional procedure for the position of Police Detective," that he was retained by the Bridgeport Civil Service Commission from November 1982 through June 1983 to "develop and administer a content-valid promotion procedure for the position of Police Sergeant," that he testified as an expert witness for intervening defendants in mid-1995 regarding the "development and validation of a written examination for Police Officer and the use of a banding procedure to interpret test scores," and that he testified as an expert witness for the defendant in federal court in Connecticut in December 1989, regarding the promotion process for the position of Police Sergeant in Bridgeport, Civil

---

[10]See Bolton v. City of Bridgeport, No. 04049828, 2004 WL 1098700 (Conn. Super. Ct. Apr. 29, 2004).

No. B89-547 (TFGD).  (Id. at 23, 27, 31, 35, 37, 38, 39).  Dr. Outtz testified that Personnel Director Colligan had requested him to review the Notice (Exh. A) also.

Dr. Outtz testified that he was aware of the fact that approximately 1300 people had taken the firefighters' examination the last time it had been administered; he was not concerned about the size of the applicant pool, unless it was unusually small, such as 50 people.  His instruction from defendants was to create an examination that was "fair" to everyone, and Dr. Outtz testified that he "strived" to create testing that was fair to all the applicants.  Personnel Director Colligan agreed that the firefighters' examination was to test for skills that were "blind to characteristics unrelated to firefighting," such as race, religion, and sports team allegiance, and was designed to be "race and ethnicity blind."  Personnel Director Colligan testified that he hired Dr. Outtz because Colligan "wanted to make sure the test was valid [and] fair to every candidate, regardless of race or gender."

By mid-August 2002, 1,842 individuals had submitted applications for a firefighter's position.  (Exh. B).  Of these, 1,458 individuals appeared to take the September 14, 2002 written examination.  Dr. Outtz acknowledged that the written test was largely objective, whereas an oral examination is "more subjective."  As established in the Notice (Exh. A), the written examination was a qualifying examination, with the passing score being seventy-five percentage of the highest score, rated on a scale of one hundred percent.

Personnel Director Colligan testified that it was his responsibility to oversee the physical agility examination; Dr. Outtz had no involvement in the development of, administration of, or scoring of the physical agility examination. Because this examination was to be administered during the last three weeks of December 2002, when there was inclement winter weather, Personnel Director Colligan decided, on his own, to test the candidates only on the six events that could be held indoors; he decided to dispense, for the

6

time being, with the two events held outdoors (running up four flights of stairs and climbing ladders), because he was concerned that a candidate might injure himself or herself.  As a result, those candidates who placed the highest scores on the oral examination later would need to complete the last two events of the physical agility examination.  Personnel Director Colligan testified that he chose not to postpone the entire physical agility examination until the spring of 2003 due to the City's "financial necessity" to fill the vacant firefighters positions.

Dr. Outtz testified that in order to develop the oral examination, he updated the information he had gathered since the last time he prepared an examination for firefighters for the BFD, for which he had interviewed the Bridgeport Fire Chief.  After speaking with four to five additional people within the BFD, he ascertained that the job requirements and responsibilities had not changed in the interim.  He then interviewed twelve incumbent firefighters in the BFD, for a detailed analysis of the various tasks they perform.  Dr. Outtz testified that he wanted to design the examination so that it would focus on the skills and tasks a firefighter would need on "day one" of his or her job.

Dr. Outtz testified that he also spoke at length with approximately twelve experts in other fire departments, particularly those individuals with tenure and expertise, usually at or above the level of a Lieutenant,  in order to "craft" the appropriate questions, including hypothetical situations in which the applicant might find himself or herself if selected to become a firefighter.   For the oral examination, Dr. Outtz wanted to assess an applicant's abilities in the following four areas: (1) ability to follow oral instructions; (2) ability to communicate clearly; (3) ability to communicate with people of different backgrounds; and (4) ability to make decisions while under pressure and stress.   Once he had prepared the oral examination, he continued to consult with these various experts, in order to "minimize idiosyncratic answers" and "situational judgments."   After completing all his interviews with

7

BFD personnel and the outside experts, Dr. Outtz prepared an comprehensive report for the BFD. (Exh. 2).

The oral examination for the BFD firefighters examination was developed in 2003, and contains five questions, described as "benchmark questions" (Questions A-E) and one evaluative question (Question F)(Exh. J).[11]  Dr. Outtz described the first five questions as "situational judgment questions" that are open-ended and do not suggest the answer.  He described the examination as being "highly structured," to minimize the interactions between the panelists and candidates. He has used some of these questions in examinations that he prepared for other fire departments.

Dr. Outtz acknowledged that there are levels of objectivity and subjectivity, but testified that this oral examination was designed to "eliminate subjectivity as much as possible."  He also conceded that "observer bias" is always "of concern" in administering tests, and that racial matters "can and sometimes do[ ]" yield bias.  Dr. Outtz is also aware that different cultures respond to "different cues," so that he worked diligently to ensure that none of the questions favored one racial group over another.

In his discussions with Personnel Director Colligan, Dr. Outtz emphasized the need for "fair and unbiased evaluators," and made no recommendations for any individual to be excluded due to his or her ethnic background or participation in an advocacy group, especially in light of the extensive training for the oral examiners.  Because Dr. Outtz is "aware of biases," he tried to design a process that would "check those biases."  The

---

[11]In order to protect Dr. Outtz's proprietary interests in the examination, and to prevent its dissemination to individuals who seek to take future firefighters' examinations, in Bridgeport and elsewhere, Exh. J was filed under seal.

During Dr. Outtz's testimony about Exh. J, the spectators in the courtroom, including plaintiffs and other applicants, graciously agreed to vacate the courtroom.  The tape of that portion of the evidentiary hearing has been filed under seal, and the Magistrate Judge will address this testimony as cryptically as possible.

evaluators for the oral examination consisted of twenty-eight individuals (twelve firefighters, fourteen Fire Lieutenants (both active and retired), and two Fire Captains) of mixed race (fourteen White, eleven Black, and three Hispanic), from various fire departments in Connecticut and Westchester County, New York.  (Exhs. E, K & N).   On the morning of February 24, 2003, these evaluators participated in an "extensive" four-hour training seminar, with practice sessions and evaluations, and were given general rules of conduct for the oral examinations from which they could not depart, as well as mandatory introductory and closing statements (Exhs. D, E, M & O).  All the examiners engaged in role-playing, in which they  practiced giving the examination and watching others give the examination. They had multiple practice sessions on scoring, "over and over until they reached a level of expertise." The test was designed to avoid "follow-up questions," in order to maintain objectivity and minimize subjectivity.

Six hundred ten applicants were interviewed over a four-day period, February 24-27, 2003, with two evaluators on each panel, usually, if possible, of differing ethnic backgrounds. (Exhs. E-F, K).  Dr. Outtz testified that he wanted diverse panels, with a "holistic view," so that they would be "checks" on one another.  He conceded that "occasionally" some panels had two Whites or two minorities.  The panelists were given new partners for the morning and afternoon sessions. The interviews generally lasted "thirty minutes at the most" and were not videotaped, due to the potential of technical problems with equipment.  Depending on the question, there were a small number or a large number of possible responses, and the evaluators noted on an answer sheet which response matched the "gist" of the applicant's answer.  After consulting with his twelve experts, Dr. Outtz determined which were the "most appropriate" answers, with some answers receiving a few points, others receiving lesser points, some receiving no points at all, and some even receiving negative points.  Dr. Outtz

emphasized that the interviewers were not aware of the scoring process, i.e., the values that were assigned to each potential answer, so that there was little opportunity for them to manipulate the results, even if they were so inclined.

In completing the computer scannable answer sheet (Exh. 3), each panelist completed the answer sheet independently, and then after consulting with one another, completed one together.  Dr. Outtz testified that he reviewed each panelist's form, to calculate the "reliability coefficient" or "correlation coefficient."  He testified that ninety-three percent of the time, each panelist's independent assessment matched that of his or her co-panelist, which Dr. Outtz described as a "high number" or a "high degree of agreement," indicating that the examiners were following his instructions.  (Exh. M).  In light of this .93 coefficient, Dr. Outtz testified that he was "highly confident in the consistency of the ratings."

On March 11, 2003, Personnel Director Colligan forwarded the Individual Interview Ratings Form, and Consensus Rating Sheets, for the 610 applicants, to Dr. Outtz.  (Exh. F). On May 27, 2003, Dr. Outtz forwarded his detailed results of the BFD oral examination, in which he first converted each section score to a "Z-score," by calculating the mean and standard deviation for each of the six questions, subtracting each candidate's raw score from the mean score, and then dividing that number by the standard deviation.  (Exh. 4, at 1-2; see also Exh. C, at 1).  Dr. Outtz had applied assigned weights to the six questions, so that Questions A and F each received a weight of .20, Questions B and D each received a weight of .25, and Questions C and E each received a weight of only .05.  (Exh. 4, at 2; see also Exh. C, at 1). These weights were then multiplied by the candidate's Z-score for each question.  (Exh. 4, at 2;  see also Exh. C, at 2).  Dr. Outtz then obtained each candidate's final score, by adding each candidate's weighted Z-scores, multiplying by ten, and then adding fifty points, so that the range for total weighted scores was from one to one hundred.

10

(Exh. 4, at 2).  Dr. Outtz's report included a tabulation for each of the 610 candidates.  (Id. at 5-21).  Dr. Outtz testified that the oral exam was a "validated examination" that showed no preference to any racial group.  He emphasized that when the computer "spit[s] . . . out" a candidate's final weighted score, the computer was unaware of the candidate's race, as was Dr. Outtz as well.  Dr. Outtz testified that the mean weighted score for Whites was 50.2316, for Hispanics was 50.2113, for Blacks was 49.4834, for Asians was 49.0207, and for Native Americans was 46.9787.

Both Dr. Outtz and Personnel Director Colligan testified to the "anomalous" situation in that Black applicants scored "extremely well" on the oral examination, particularly on Question C, as compared to White candidates.  Personnel Director Colligan testified that no efforts were made by the City to assist minority candidates.  Personnel Director Colligan requested Dr. Outtz to investigate the matter.

On July 2, 2003, Dr. Outtz sent a letter to Personnel Director Colligan, in which he acknowledged the "skewed" and "unusual" results for Question C, namely that thirty-one of the 610 candidates (or 5.08%) scored two standard deviations above the mean answer, which is normally reserved for the top 2.5%.  (Exh. G, at 1).   "[E]ven more unusual," however, was that of these thirty-one top-scoring candidates, eighteen (or 58.0%) were Black, seven (or 23.0%) were Hispanic, and six (or 19%) were White.  (Id. at 2).   Of the 610 participants in the oral examination, 353 (or 57.9%) were White, 124 (or 20.3%) were Black, 114 (or 18.7%) were Hispanic, and the balance of 19 (or 3.1%) were Asian, Native American or Undeclared.  (Id.).  While conceding that the raw score results for Question C were "highly unusual," Dr. Outtz emphasized that "the raw scores from each section . . .  were statistically weighted before determining each candidate's final score," so that "the anomalies . . . had little effect on the final outcome of the [e]xamination."  (Id. at 3).  As he explained in this letter

(id. at 1), Dr. Outtz testified that there was a "plausible explanation" to the anomaly, namely that "[a] significant number of the Bridgeport candidates . . . gave an extraordinarily large number of responses" to Question C, as opposed to the two or three answers generally given in the past. As Dr. Outtz testified, some candidates will "throw out a lot of answers," taking a "shot gun approach" to their responses. Dr. Outtz testified that at the time he prepared his July 2, 2003 letter, he was unaware of an independent investigation by the Bridgeport Police Department on this matter.

After being informed of the results of the Bridgeport Police Department's investigation, the matter was "resolved to [Personnel Director Colligan's] satisfaction." Personnel Director Colligan was not made aware of any cheating on the examination, and there was no evidence that the manner in which the test was administered helped minority applicants. Because there was no reason to invalidate the test results, on October 2, 2003, Personnel Director Colligan's office prepared a computer-generated list of rankings, for numbers 1 through 613, for the candidates, based upon their weighted scores on the oral examination and thus "published" the list; the race of each applicant later was added in handwriting. (Exhs. P & Q).[12]

Personnel Director Colligan testified that the City of Bridgeport did not hire any new firefighters during 2002, 2003, or 2004, and that the City's need is "still urgent" in light of the

---

[12]As previously indicated, see note 9 supra, § 211(a) of the Bridgeport Regulations provides: "[T]he answers to all questions in competitive written examinations [shall be] posted as soon as possible thereafter and not later than ninety days from the date of the test." (Exh. S, at 10-11). Personnel Director Colligan testified that the answers to the written examination had been posted within ninety days of the test. He further testified that he had delayed the "publishing" of the rankings, while the police investigation was ongoing.

Section 211(a) further provides: "The commission shall cancel such portion of any list as has been in force for more than two years." (Exh. S, at 11). Personnel Director Colligan testified that under an advisory opinion issued in the late 1980's to his predecessor by a member of the Bridgeport Corporation Counsel's office, the term "in force" starts to run when the first hire is made under the list, not when the list is created.

attrition that has occurred during those three years. Personnel Director Colligan further testified that he gave no consideration to holding another examination, because that would be "unfair" to the candidates who performed well on the February 2003 oral examination.

As previously mentioned, the notice for the firefighters' examination advised prospective applicants "who ha[ve] been convicted of a felony, or [are] of bad moral character" would be ineligible for the position. (Exh. A, at 2).  After receiving the results of the rankings, Personnel Director Colligan's office gave the names to the Internal Affairs Department of the Bridgeport Police Department for background investigations, to determine if any of the candidates had previous felony convictions, or convictions for serious misdemeanors or serious motor vehicle violations, or poor work records.  Personnel Director Colligan was notified that four individuals whose names appear on the ranking list have felony convictions, including Earl King, tied for #16 (Black), and José Torres, tied for #30 (Hispanic)(Exh. Q, at 1 & 2).[13]  Section 212 of the Bridgeport Regulations provides: "The personnel director may . . . refuse to certify the name of an [individual] eligible for employment who . . . has been guilty of any crime or infamous or notoriously disgraceful conduct . . . ." (Exh. S, at 12).  Pursuant to § 212, Personnel Director Colligan "disapproved" of these four candidates.  However, § 212 further provides: "Any such person may appeal to the civil service commission from the action of the personnel director in accordance with the rules established hereunder." (Exh. S, at 12).  All four individuals exercised their appeal rights under § 212, and hearings were held before the Civil Service Commission at which Personnel Director Colligan and the Fire Chief spoke against the candidates, while then State Senator Ernest Newton and Ronald Mackey, an officer with the Firebirds, spoke in favor of the candidates. Over Personnel Director Colligan's objections, the Civil Service Commission

---

[13]The other two candidates have much lower rankings and are not likely to be selected.

found that King and Torres were not disqualified for the position of firefighter. Personnel Director Colligan testified that the administrative hearing for King occurred while Colligan was still in his position, whereas the administrative hearing for Torres was held after Colligan had retired. According to handwritten notes on Exh. Q, the Civil Service Commission made its decision with regard to King on June 8, 2004, and its decision with regard to Torres on August 18, 2005. (Exh. Q, at 1 & 2).

Personnel Director Colligan testified that the BFD was unable to use the employment list until these administrative appeals were completed. He also testified that John Bolton, the first named plaintiff who is White, is tied for #192 on the list. (Exh. Q, at 8).

## II. DISCUSSION

As the Second Circuit has held, under somewhat similar circumstances, where the NAACP sought to enjoin the hiring of police officers or firefighters:

> A party seeking a preliminary injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. This second "serious questions" prong is also frequently termed the "fair ground for litigation" standard. However, the fair-ground-for-litigation prong may not be considered where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme. The moving party in such a case must establish, to the satisfaction of the district court, both irreparable injury and a likelihood of success on the merits.

NAACP v. Town of East Haven, 70 F.3d 219, 223 (2d Cir. 1995)(multiple citations & internal quotations omitted).

The Second Circuit continued:

> It seems clear from the record before us that the Town of East Haven administers civil service examinations and hires police officers and firefighters pursuant to established municipal regulations and state civil service laws. It cannot be gainsaid that the hiring of police officers and firefighters is in the public interest. In order to prevail, therefore, appellants must establish irreparable harm and likelihood of success on the merits.

14

Id.  See also Gomez v. City of New York, 2005 WL 1790134, at *2 (S.D.N.Y. July 27, 2005); Karmel v. City of New York, 200 F. Supp. 2d 361, 364-65 (S.D.N.Y. 2002).  In their post-hearing brief, plaintiffs argue that they have satisfied the "substantially serious question" prong (Dkt. #72, at 8-11), whereas defendants argue that the standard is "likelihood of success on the merits."  (Dkt. #73, at 14).

As the Second Circuit held in NAACP, "the denial of job opportunities and the loss of training and competitive advantages that may be gained from such opportunities can constitute 'serious or irreparable harm.'" 70 F.3d at 224 (citation omitted).  In both  NAACP and this case, job openings for firefighters occur sporadically, and if the municipalities were to "fill the present openings and the [plaintiffs] ultimately prevail, the granting of relief . . . would be complicated indeed."  Id. (citation omitted).

Defendants argue plaintiffs presented no evidence that use of the present firefighters' list will result in irreparable harm, in that "plaintiffs adduced no evidence regarding the number of firefighter vacancies or the frequency with which they are expected to be filled." (Dkt. #73, at 15-16).  Personnel Director Colligan testified as to the "urgent need" for firefighters in the City of Bridgeport, beginning in 2002, and that this need is "still urgent," in light of the attrition that has occurred in the interim.  In the four years since 2002, despite an "urgent need" for more firefighters, no hirings were made, thus indicating the infrequency of entry level appointments to the BFD.

Defendants are correct that plaintiffs did not elicit evidence as to the number of candidates who will be called from the final list.  From a manual review of the eligibility list, it appears that of the seventeen named plaintiffs, the plaintiff who is highest on the list is Michael Corraro, who is tied for #167. (Exh. Q, at 7).   While Personnel Director Colligan was never asked to testify about the number of openings, there was never any indication that the

number of openings was as high as 167, despite the BFD's "urgent need" for additional firefighters.[14]  Given the infrequency with which firefighters are hired in the City of Bridgeport and given the likelihood that none of the seventeen plaintiffs will be called from the current list of candidates, plaintiffs have sustained their burden with respect to irreparable harm.

Plaintiffs have not met their burden with respect to the second prong, regardless of whether the standard is "likelihood of success on the merits," or "sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief."  Like here, in Hayden v. County of Nassau, 180 F.3d 42 (2d Cir. 1999), the plaintiffs were White and Latino applicants to a police department, who contended that the entrance examination was designed to minimize discriminatory impact on minority applicants, which in turn discriminated against them.  The Second Circuit held:

> To state a claim for an equal protection violation, [plaintiffs] must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender.  Such intentional discrimination can be demonstrated in several ways.  First, a law or policy is discriminatory on its face if it expressly classifies people on the basis of race or gender.  In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion.  Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.

Id. at 48 (multiple citations omitted).

As in Hayden, at the evidentiary hearing here, plaintiffs failed to demonstrate facial classification, discriminatory application, or discriminatory animus.  Id. at 50-51.  If anything, the testimony of Dr. Outtz and Personnel Director Colligan demonstrated an overriding effort to make the application process as fair and open as possible to all candidates. Plaintiffs presented no evidence  that the first five questions in the oral examination, in and of

---

[14]In their initial brief in support of their motion, plaintiffs indicated, based "[u]pon information and belief," that defendants sent letters to twenty candidates (Dkt. #56, at 5), a number that is substantially smaller than 167.

themselves, are culturally biased.  (Exh. J).  Dr. Outtz testified at great length regarding the steps he undertook, in interviewing members of the BFD and twelve experts outside the department, in preparing the questions and ascribing the appropriate weights to the answers given by the candidates.  The first five questions are open-ended and do not suggest the correct answer.

Dr. Outtz also testified at great length regarding the measures he undertook to ensure that the oral examination was administered in a fair and impartial manner.   Plaintiffs are correct that in an oral examination, the examiners have an opportunity to view the candidate and ascertain his or her race.  However, the test was administered in such a fashion that any racial bias by an examiner, either for or against a candidate, would have no impact upon the candidate's score on the oral examination.  The examiners underwent four hours of training, including role-playing in which they had an opportunity to watch others give the oral examination.  The twenty-eight examiners were of mixed race; as much as possible, the two-person panel consisted of individuals of differing ethnic backgrounds, to be "checks" on one another, and the panels were rotated between the morning and afternoon sessions.  The examination was "highly structured," to minimize the interactions between the panelists and candidates, with the panelists to follow  essentially a prescribed script, without any follow-up questions.  (Exh. D, M & O).  The examiners were not aware of the values to be given to possible answers, so that even if they were inclined to assist a candidate (due to race or any other factor), they were not in a position to do so.  Dr. Outtz also testified that he compared the answer sheets completed by each panelist individually with that of his or her co-panelist, and found that they were similar ninety-three percent of the time, which he described as a "high degree of agreement."  Therefore, even though the panelists were of different ethnic backgrounds, they generally viewed the candidates in the same manner.  Like plaintiffs, Dr.

17

Outtz and Personnel Director Colligan agree that an "anomaly" occurred in that Black applicants scored "extremely well" on the oral examination, particularly on Question C, as compared to White candidates.  Dr. Outtz and the Bridgeport Police Department conducted independent investigations.  Dr. Outtz found that there was a "plausible explanation" and that the anomaly had "little effect on the final outcome" of the examination (Exh. G), particularly because Question C was given so little weight. (Exhs. 4 & C).   Personnel Director Colligan testified that the matter was resolved to his satisfaction.[15]

Plaintiffs are correct that in contradiction of the Notice (Exh. A), four individuals appear on the list who are convicted felons, including Earl King, tied for #16, who is Black, and José Torres, tied for #30, who is Hispanic.  As Personnel Director Colligan testified, he "disapproved" of these four candidates under § 212 of the Bridgeport Regulations, but his decision was overruled, over his objection and that of the Bridgeport Fire Chief, by the Bridgeport Civil Service Commission.  Among the people who spoke on behalf of the candidates were former State Senator Ernest Newton and a member of the Firebirds, both of whom are Black.  However, plaintiffs put on no evidence of racial bias on the part of the Bridgeport Civil Service Commission, other than that the four candidates who were  convicted felons were minorities and two people who spoke on their behalf were also minorities.

Thus, plaintiffs have not met their burden with respect to the second prong, regardless of whether the standard is "likelihood of success on the merits," or "sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief."

---

[15]In their post-trial brief, plaintiffs voice no concerns over the physical agility examination. (Dkt. #72).

III. CONCLUSION

For the reasons stated above, plaintiffs' Motion for [Preliminary] Injunction (Dkt. #55) is <u>denied</u>.

<u>See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within ten days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary, H&HS</u>, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated this 7th day of February, 2006, at New Haven, Connecticut.


_____/s/_____
Joan Glazer Margolis
United States Magistrate Judge

19