UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

John Bolton, et al.,          :
      Plaintiffs,             :
                              :
v.                            :      Case No. 3:04cv670 (JBA)
                              :
City of Bridgeport, et al.,   :
      Defendants.             :

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 86]

Plaintiffs, 18 Caucasian males who took the open competitive examination for the position of firefighter in the Bridgeport, Connecticut Fire Department in 2002-2003, bring this action against the City of Bridgeport, current and former Bridgeport mayors John Fabrizi and Joseph Ganim, former City of Bridgeport personnel director John Colligan, former Bridgeport Fire Department Chief Michael Maglione, and former and current members of the Bridgeport Civil Service Commission Leonor Guedes, Carmen Marcano, Ralph Ford, and Richard Rodgers.  Plaintiffs bring this action under 42 U.S.C. § 1983 seeking a remedy for alleged violations of the Fourteenth Amendment of the United States Constitution through denial of plaintiffs' right to equal protection "by enforcing a policy of reverse discrimination in which the plaintiffs were denied employment as firefighters for the City of Bridgeport because of the plaintiffs' race."  Am. Compl. [Doc. # 43] ¶ 1.

Defendants move for summary judgment contending that

plaintiffs have no credible evidence to support their equal
protection claim [Doc. # 86], which motion plaintiffs oppose,
conceding "they have no 'smoking gun' in this case," but
contending, <u>inter alia</u>, that the "anomalies that are either
ignored or cannot be explained" could support an inference of
denial of plaintiffs' equal protection of the law, <u>see</u> Pl. Opp.
[Doc. # 87] at 10.  For the reasons that follow, defendants'
Motion will be granted.

I.   **Factual Background**

     The factual events underpinning this dispute are largely
undisputed.  The City of Bridgeport's civil service system was
created in 1935 and since that time all firefighter positions in
the Bridgeport Fire Department have been in the competitive
division of the classified service and subject to administration
by the Bridgeport Civil Service Commission.  <u>See</u> <u>State ex rel.</u>
<u>Chernesky v. Civil Serv. Comm'n</u>, 141 Conn. 465 (1954); City of
Bridgeport Conn. Civil Serv. Comm'n, <u>Civil Serv. Provisions of</u>
<u>the Charter & Rules of the Civil Service Comm'n</u> ("Civil Serv.
Provisions") § 205(a).  The Civil Service Commission appoints "a
personnel director and such examiners, investigators, clerks and
other assistants as may be necessary to carry out the [civil
service] provisions in th[e] [Charter]."  Civil Serv. Provisions
§ 204(a).  Civil Service Provision § 211 provides as follows in
relation to examinations and employment lists for positions in

2

the competitive division:

> The personnel director shall, from time to time, as
> conditions warrant, hold tests for the purpose of
> establishing employment lists for the various positions
> in the competitive division of the classified service.
> Such tests shall be public, competitive and open to all
> persons who may be lawfully appointed to any position
> within the class for which such examinations are held
> with limitations specified in the rules of the
> commission as to residence, age, health, habits, moral
> character and prerequisite qualifications to perform
> the duties of such position, provided applicants shall
> be citizens of the United States.

> All tests shall be practical, and shall consist only of
> subjects which will fairly determine the capacity of
> the persons examined to perform the duties of the
> position to which the appointment or promotion is to be
> made, and may include tests of physical fitness or of
> manual skill.  No credit shall be allowed for service
> rendered under a temporary appointment.  No question in
> any test shall relate to religious or political
> opinions or affiliations.  No questions which are
> misleading or unfair or in the nature of catch
> questions shall be asked, nor shall the identity of any
> applicant be disclosed to the examiner or to the one
> correcting the applicant's test.

> Such persons shall rank upon the list in the order of
> their relative excellency as determined by the tests
> without reference to priority of time of tests.  The
> markings of all tests shall be completed, the resulting
> employment list and the answers to all questions in
> competitive written examinations posted as soon as
> possible thereafter and not later than ninety days from
> the date of the test.  The commission shall cancel such
> portion of any list as has been in force for more than
> two years.

Civil Serv. Provisions § 211(a).  Section 211.1 of the Civil

Service Provisions also states: "It shall be the duty of the

civil service commission and the personnel director to take

affirmative steps to insure that examinations conducted . . . . :

3

(1) are non-discriminatory; (2) are based on valid indicators of whether an applicant possesses the skills and abilities required for the job in question; and (3) comply with all state and federal laws and regulations concerning examinations for public employment." Prior to the administration of the examinations at issue in this case, the defendants created a recruitment team for the purpose of recruiting minority and female candidates to take the entry level firefighter examination. See Maglione Aff. ¶ 5 [Doc. # 86-2, Ex. L-1].

On May 31, 2002, the City of Bridgeport announced that it was holding an open competitive examination for the position of firefighter. Notice [Doc. # 87, Ex. A]; Colligan Test.[1] [Doc. # 86-2, Ex. B] at 14. The Notice provided, inter alia:

RESIDENT PREFERENCE: An individual domiciled in the City of Bridgeport who receives a passing mark on an open competitive examination shall have 10% added to their passing grade in determining his or her order or rank on the eligibility list, said points shall be in addition to any applicable veteran's preference points.

REQUIREMENTS: . . . No candidate will be considered for appointment who has been convicted of a felony, or is of bad moral character.

SUBJECTS OF EXAMINATION: Written examination, qualifying oral examination, 100%. Passing candidates on written examination will participate in the physical agility examination; those candidates who pass the physical agility examination will participate in the

---

[1]  The testimony cited in this Ruling refers to testimony given before Magistrate Judge Joan Glazer Margolis in relation to plaintiff's Motion for Preliminary Injunction, which motion was denied.

4

oral examination.  Scores from the oral component will
be used to rank order applicants for selection.

EXAMINATION REVIEW PROCEDURES: Each candidate will have
an opportunity to review his/her examination papers
during the one-month period after the date of announced
results.  The papers will be open to inspection during
the period of 9:00 A.M. to 1:00 P.M. Monday through
Friday.  Candidates will not be allowed to review
copyrighted material, or scoring keys.

Notice at 1-3.  Pursuant to Section 212 of the Civil Service

Provisions, the personnel director (Colligan) had the authority

to "reject the application of any person for admission to a test

or refuse to test any applicant or refuse to certify the name of

an eligible [sic] for employment who is found to lack any of the

established qualification requirements for the position for which

he applies or for which he has been tested, . . . , or who has

been guilty of any crime or infamous or notoriously disgraceful

conduct, . . . Any such person may appeal to the civil service

commission from the action of the personnel director in

accordance with the rules established hereunder."

Thus, according to the Notice, all applicants were required

to take a written qualifying examination; applicants who passed

the written examination proceeded to participate in the physical

agility examination; applicants who passed the physical agility

examination advanced to the oral examination stage.  Applicants

would then be rank-ordered based exclusively on their performance

on the oral examination.  The written examination was

administered on September 14, 2002, and 1,458 applicants

participated.  Outtz Test. [Doc. # 86-2, Ex. A] at 30.  The next
stage was the physical agility examination, which measured the
ability of candidates on tasks related to performing as a
firefighter; qualified candidates completed six of the eight
agility events during the winter of 2002-2003, but due to
inclement weather and related safety concerns, the remaining two
events were postponed.  Colligan Test. at 14-16.  Mr. Colligan
decided to allow candidates who had passed the first six physical
agility events to sit for the oral exam, in order to move the
process along; upon completion of the oral examination, the
candidates with the highest standing would be required to
complete the remainder of the agility test.  Id. at 17-20.

610 individuals qualified to take the oral examination,
which was administered over a four day period in February 2003.
Outtz Test. at 31; Colligan Test. at 36.  The oral examination,
as well as the written qualifying examination, was developed by
Dr. James Outtz, an industrial organizational psychologist, who
designs testing procedures for employers looking to hire classes
of employees in both the public and private sectors.  Outtz Test.
at 3.  After being retained by the City of Bridgeport in 2001,
Dr. Outtz began preparing the examinations by conducting a job
analysis of the firefighter position to determine what it
consists of in terms of tasks, required abilities, knowledge, and
skills.  Id. at 13, 140-41.  In conducting this analysis, Dr.

Outtz interviewed and spoke with incumbents in the Bridgeport Fire Department and got their reactions to the "inventory" of the firefighter position, i.e. the tasks, areas of knowledge, and abilities that make up the job, that he had developed.  Id.  In developing the oral examination, Dr. Outtz determined that four abilities were important: the ability to follow oral instructions, the ability to express oneself clearly, the ability to communicate orally with persons from different backgrounds, and the ability to make judgments under pressure; the oral examination was thus designed to test for these abilities.  Id. at 147-49.

Specifically, Dr. Outtz developed the oral examination by consulting with 12 "subject matter experts" in other fire departments, showing them the four abilities, and working with them to craft questions that they believed would address those abilities.  Id. at 16-17, 35, 91-92.  The subject matter experts formulated the questions and answers for each question, which were referred to as "benchmarks."  Id. at 92-93, 98-99.  One question might have more than one possible "benchmark," and each benchmark was assigned a point value which varied based on the ratings by the experts of the answers they felt best reflected the kind of abilities the exam was trying to measure.  Id. at 98-99.  The examination questions were open-ended and did not suggest any answer.  Id. at 67-68.

None of the subject matter experts served as panelists in administering the oral examination, of which there were 28 members who were individuals with managerial responsibility in other fire departments; there were 14 Caucasian members, 11 African-American Members, and three Hispanic members.  Id. at 98, 105, 123, 156.  Prior to the administration of the oral examination, the panelists were trained by Dr. Outtz about the "benchmarks" and practiced scoring sample responses until they reached a level of consistency, id. at 63-64, 100, 150; they were given the "Bridgeport Civil Service Oral Interview for Firefighter Interview's Introductory and Closing Statements," created by Dr. Outtz, which was intended to control the interaction between applicants and panelists, id.  at 151-53; and they participated in role-playing so they understood how to conduct the examination, id.  The panelists were also trained to recognize whether an applicant's answer fit into one of the "benchmark" categories for each question.  Id. at 74-75.  One panel consisting of two members interviewed each applicant, and Dr. Outtz assigned the panels attempting to have racially diverse panels wherever possible.  Id. at 156.  Additionally, panels would not stay together for the entire process, but rather were reassigned between morning and afternoon sessions.  Id. at 123-24.

When conducting the examination, each panelist had the

8

examination questions and benchmarks before him/her and was instructed to read each question verbatim, record and write down what the applicant said, and then determine the degree to which the response fit any of the benchmark responses.  Id. at 99-100. After an interview was concluded, each panelist used a rating form to rate the applicant's responses; the two panelists then discussed their ratings with each other to resolve discrepancies, and ultimately agreed on a rating which was memorialized in a third form, which was given to Dr. Outtz for scoring.  Id. at 85-88.  The panelists did not have any information about benchmark answer point values, and at least one in three benchmark responses on the examination had a negative point value.  Id. at 172, 77-78.  When scoring the examinations, Dr. Outtz did not know the identities or race of the applicants, only the identification number they had been given.  Id. at 170. Additionally, panelists were not given the names or races of any applicants, although, as plaintiffs note, they were obviously able to observe the physical characteristics of the applicants they interviewed.  Id. at 170-71.  After scoring the examination, Dr. Outtz sent the results back to the Civil Service Commission, whereupon a final ordered list was generated and, for the first time, Mr. Colligan was able to identify the performance of a particular applicant by name and race.  Colligan Test. at 10-11. Dr. Outtz also reviewed the individual rating forms completed

separately by each panelist to determine a "reliability coefficient," i.e. the degree of similarity between the individual ratings; the closer the two members rated applicants, the higher the reliability coefficient. Dr. Outtz calculated a reliability coefficient of .93, which he testified was 'excellent," indicating a high degree of consistency/agreement among panelists. Outtz Test. at 84-88, 101-03, 154-55.

When the results of the oral examination were rank ordered, Colligan expressed concern about "anomalous" results and "whether people of color scored higher than they ought to have." Colligan Test. at 13-14; Outtz Test. at 128-29. For example, 57.9% of applicants participating in the oral examination were Caucasian, 20.3% were African-American, and 18.7% were Hispanic, but of the top 23 persons ranked after the examination, 78% were either African-American or Hispanic. See 7/2/03 Outtz Letter [Doc. # 87, Ex. C]; Table of Results [Doc. # 87, Ex. D]. Colligan requested that the police department conduct an investigation, the report of which gave him no reason to invalidate the examination. Colligan Test. at 77-78, 80-81.

Colligan also asked Dr. Outtz to look into the matter, and Dr. Outtz uncovered, after a question-by-question analysis using standard deviation, anomalies on the basis of race in the responses to Question C of the examination only. Outtz Test. at 158-60; id. at 130 ("Question C showed . . . that with respect to

black participants, an extraordinarily high percentage, in number, of them, scored in the top two and a half percent on that question . . . compared to their percentage in the application pool".). Outtz testified, with respect to the anomalies in responses to Question C, that "there was about a one in a thousand chance of that happening by chance," id. at 131, and he believed the results related to the style of an applicant's response because Question C was "susceptible" to a "shotgun approach" where an applicant "throw[s] out every answer that they can think of," because "you got credit for whatever answers you gave" in Question C. Id. at 135. Dr. Outtz also applied "Z Scoring" to the scoring of examination results, which method involves weighing each section of an examination based on what it was measuring; however, weights could not be applied to raw scores because some questions had more possible responses than others (for example, Question C had 13 responses). Id. at 160-61. Thus, "a person could have the same raw score, in terms of adding up scores across sections, but they made those scores from different sections, and the different sections have different weights." Id. at 163. "When the weights were applied, because [Questions] C and E allowed the person to get multiple credit for any number of responses, without restraint, and a person could shotgun those questions, they were given the least weight." Id. at 161. In fact, the weight of Section C was .05, meaning on a

11

scale of 1-100%, it had a weight of only 5%.  Id. at 165.  In
light of this, the anomalous results identified by Dr. Outtz did
not, in his opinion, invalidate the examination, because "the
weight given to [Section C] was so low until you – you had to
perform well on the other sections in order to have a high score
on the oral.  That score, the weight was so small, . . . it
wasn't gonna have very much influence on where you were at all."
Id. at 166.

Once Colligan's concerns were "resolved to [his]
satisfaction," Colligan Test. at 37, the final rank ordered list
could be determined, taking into account any residency
"preference points," which were provided by a City of Bridgeport
Council ordinance and were applied irrespective of race, id. at
85.[2]  On October 3, 2003, the City established a rank order list
of candidates by points, but pursuant to Civil Service Provision
§ 212, Colligan still had the authority to disqualify candidates
based on background investigations.  Colligan refused to certify
the names of at least four minority candidates (one African-
American and three Hispanic) who had previously been convicted of
felonies.  Colligan at 93-94.  Those individuals appealed their
disqualifications, pursuant to Section 212, and their appeals
were successful.  As noted above, Civil Service Provision 211

---

[2] Plaintiff John Bolton received residency preference points.
Colligan Test. at 100.

provides that hiring lists have a shelf-life of only two years.
It is Colligan's opinion, which plaintiffs dispute, that the
hiring list was not finalized and useable until after the appeals
impacting such list were resolved.  Colligan Test. at 56-57, 96-
97; Pl. Stmt. of Facts [Doc. # 88] ¶¶ 15-16.

## II.   Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits . . . show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c).  A party seeking summary judgment "bears the burden of
establishing that no genuine issue of material fact exists and
that the undisputed facts establish [its] right to judgment as a
matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060
(2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144,
157 (1970)).  "The duty of the court is to determine whether
there are issues to be tried; in making that determination, the
court is to draw all factual inferences in favor of the party
against whom summary judgment is sought, viewing the factual
assertions in materials such as affidavits, exhibits, and
depositions in the light most favorable to the party opposing the
motion." Id. (citations omitted).  "If reasonable minds could
differ as to the import of the evidence . . . and if there is any

13

evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir.

14

1994) ("[T]he moving party may obtain summary judgment by showing
that little or no evidence may be found in support of the
nonmoving party's case.").  The non-moving party, in order to
defeat summary judgment, must then come forward with evidence
that would be sufficient to support a jury verdict in his or her
favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  Matsushita, 475 U.S. at 587.
However, a party opposing summary judgment "may not rest upon the
mere allegations or denials of the adverse party's pleading,"
Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the
material facts" is insufficient.  Matsushita, 475 U.S. at 586
(citations omitted).

## III. Discussion

"The Equal Protection Clause of the Fourteenth Amendment
commands that no State shall 'deny to any person within its
jurisdiction the equal protection of the laws,' which is
essentially a direction that all persons similarly situated
should be treated alike."  City of Cleburne v. Cleburne Living
Ctr., 473 U.S. 432, 439 (1985).  Non-minorities have been found
to be in a protected group for purposes of standing under the

15

Equal Protection Clause.  <u>See</u>, <u>e.g.</u>, <u>Adarand Constructors, Inc.</u>
<u>v. Pena</u>, 515 U.S. 200, 210 (1995) (holding that a non-minority-
owned business' "allegation that it has lost a contract in the
past because of a [minority set-aside] subcontractor compensation
clause of course entitles it to seek damages for loss of that
contract").

    "To state a claim for an equal protection violation,
[plaintiffs] must allege that a government actor intentionally
discriminated against them on the basis of race, national origin
or gender." <u>Hayden v. Cty. of Nassau</u>, 180 F.3d 42, 48 (2d Cir.
1999).  "Such intentional discrimination can be demonstrated in
several ways.  First, a law or policy is discriminatory on its
face if it expressly classifies persons on the basis of race or
gender. . . . In addition, a law which is facially neutral
violates equal protection if it is applied in a discriminatory
fashion. . . . Lastly, a facially neutral statute violates equal
protection if it was motivated by discriminatory animus and its
application results in a discriminatory effect." <u>Id</u>.  Thus, as
the Supreme Court has stated, "[t]hough the law itself be fair on
its face, and impartial in appearance, yet, if it is applied and
administered by public authority with an evil eye and an unequal
hand, so as practically to make unjust and illegal
discriminations between persons in similar circumstances,
material to their rights, the denial of equal justice is still

16

within the prohibition of the constitution." Yick Wo v. Hopkins,
118 U.S. 356, 373-74 (1886).

As the Hayden breakdown of equal protection theories makes
clear, "[p]laintiffs challenging . . . facially neutral laws on
equal protection grounds bear the burden of making out a 'prima
facie case of discriminatory purpose.'" Jana-Rock Constr., Inc.
v. N.Y. State Dep't of Economic Dev., 438 F.3d 195, 204 (2d Cir.
2006) (citing Washington v. Davis, 426 U.S. 229, 241 (1976)).
Thus it is clear "that official action will not be held
unconstitutional solely because it results in a racially
disproportionate impact.  Disproportionate impact is not
irrelevant, but it is not the sole touchstone of an invidious
racial discrimination. . . . Proof of racially discriminatory
intent or purpose is required to show a violation of the Equal
Protection Clause." Village of Arlington Heights v. Metro.
Housing Dev. Corp., 429 U.S. 252, 264-65 (1977) (citing Davis,
426 U.S. at 242).  "[Washington v.] Davis does not require a
plaintiff to prove that the challenged action rested solely on
racially discriminatory purpose" and "proof that a discriminatory
purpose has been a motivating factor in the decision" is
sufficient.  Id. at 265-66.  "Determining whether invidious
discriminatory purpose was a motivating factor demands a
sensitive inquiry into such circumstantial and direct evidence of
intent as may be available.  The impact of the official action

17

whether it bears more heavily on one race than another . . . may provide an important starting point.  Sometimes a clear pattern, unexplainable on grounds other than race, emerges," however absent a "stark" pattern, "impact alone is not determinative." Id. at 266.  Other circumstantial factors courts may consider include: "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," "[t]he specific sequence of events leading up [to] the challenged decision," "[d]epartures from the normal procedural sequence," any "legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  Id. at 266-68.  However, where a test is "administered and scored in the same manner for all applicants," plaintiffs cannot make out a claim that the examination was applied in a discriminatory manner.  Hayden, 180 F.3d at 50.  Additionally, "[a] desire to reduce the adverse impact on [minorities] and rectify hiring practices . . . is not analogous to an intent to discriminate against non-minority candidates."  Id. at 51.

Plaintiffs contend that taking into account the choice of an oral examination, the disproportionate results favoring minorities, the successful appeals of the four minority convicted felons, and the pre-examination recruiting of minorities, there

18

is evidence from which a jury could infer discriminatory intent. Plaintiffs repeatedly refer to the fact that no explanation for the disproportionate test results has been offered, Pl. Opp. at 5 ("No explanation is given for how this occurred, merely an assertion that efforts were made to make the oral examination race neutral, so, therefore, it must be, results be damned!"), question whether "it [was] the race and ethnicity of the felons that led the defendants to turn a blind eye toward what should have been a disabling status," id. at 8, and "contend that there is something fishy about the defendants' explanation for the racial anomalies in this case," id. at 9.  Plaintiffs' contentions, however, amount to no more than speculation of discriminatory intent, without any supporting evidence.

As to the choice of an oral examination, plaintiffs dispute defendants' contention that there is nothing in the Civil Service Provisions prohibiting an oral examination or requiring a written one, however they have submitted no evidence to the contrary. Review of the Civil Service Provisions in the record reveals no such requirement or prohibition.  Additionally, defendants' contention that they considered an oral examination because written examinations had been found to have a disproportionately adverse impact on minorities, see Colligan Test. at 87-88, and the fact that defendants formed a minority recruitment team prior to administration of the examination, provide insufficient basis

19

from which to infer discriminatory purpose because, as noted above, a desire to reduce adverse impact on minorities and/or to rectify prior discriminatory hiring practices does not demonstrate an intent to discriminate against non-minorities. See, Hayden, supra, 180 F.3d at 51.

With respect to the disproportionate rankings (and results on Question C of the examination), as the Supreme Court held in Arlington Heights, 429 U.S. at 264-65, disproportionate impact alone, without proof of racially discriminatory intent or purpose, is not sufficient to support an equal protection claim. Considering the categories of potential circumstantial evidence of discriminatory intent or purpose articulated in Arlington Heights, none supports an inference of such intent or purpose – neither the historical background of or sequence of evidence leading to the creation, development, administration, and scoring of the examination reveal any racial motivation other than the desire to ameliorate previous adverse impact on minorities; while an oral examination was utilized as opposed to an exclusively written examination, as had been used in the past, defendants have articulated a legitimate reason for that decision, to which plaintiffs offer no evidence of pretext; lastly, there is no evidence of contemporaneous statements by any of defendants suggesting discriminatory animus.  The testimony of Dr. Outtz relied on by plaintiffs that there is only a 1 in 1,000 chance

that the anomalous results on Question C resulted by coincidence does not support an inference of such animus because Dr. Outtz had a legitimate non-discriminatory explanation for the disparity (use of the "shotgun" response approach in answering that question).

Further precluding an inference of discriminatory intent from the fact of the disproportionate impact alone is the record evidence that many precautions were taken to guard <u>against</u> any discriminatory intent or purpose infecting the examination results.  For example, as detailed above, the panelists who interviewed and rated the applicants did not know the point values of each "benchmark" answer, some of which had negative point values, and thus would have been unable to skew their ratings to favor minorities applicants.  The panelists were trained and tested to ensure consistency and Dr. Outtz's analysis found an "excellent" reliability coefficient.  Lastly, Dr. Outtz, who tabulated the scores, did not know the identity or racial classification of the applicants while he was calculating the scores.  Moreover, Dr. Outtz testified that due to the Z Scoring, the anomalous results of Question C, the only anomaly he found on the oral examination, had very little impact on the overall scoring.  Thus, there is no evidence beyond the "bare statistic," that is, the ranking results, to support plaintiffs' claim, and such "statistical proof must present a 'stark' pattern to be

accepted as the sole proof of discriminatory intent under the
Constitution.  [But] the record here is utterly devoid of any
evidence suggesting a discriminatory intent or purpose." <u>Chesna</u>
<u>v. U.S. Dep't of Defense</u>, 850 F. Supp. 110, 117 (D. Conn. 1994)
(Cabranes, J.) (summary judgment granted on equal protection
claim where hourly employee plaintiff "presented nothing more
than one bare statistic" that 55% of the total employee
population were hourly employees while 89% of security clearance
revocations involved hourly employees, and defendant "presented
ample evidence refuting [plaintiff's] bald claim of
discrimination").

　　Additionally, while defendants utilized the City-residency
point enhancement, which may have disproportionately advantaged
minorities (although there is no evidence that it did), and the
Civil Service Commission defendants granted the appeals of four
minority convicted felons who Colligan initially disqualified
from the list, there is no evidence offered to dispute that these
actions were taken in a race-neutral manner.  All applicants who
were City residents received the same point enhancement pursuant
to the ordinance adopted by the City Council; indeed, this policy
was articulated in the Notice soliciting applicants established
before individuals even applied for the examination and thus
defendants could not have known what effect it might have on
minorities versus non-minorities.  Similarly, Civil Service

22

Provision § 212 provides for appeal of a disqualification decision, and the Civil Service Commission defendants have provided a race-neutral reason for their granting of the four appeals – specifically, their findings that the individuals had rehabilitated themselves since their convictions.  Interrog. Resp. [Doc. # 86-2, Ex. K].  Indeed, plaintiffs <u>admit</u> in their Conn. L. Civ. R. 56a(2) Statement defendants' contention that the appeal decisions "had nothing to do with the race of the candidates."[3]  <u>See</u> Def. Stmt. of Facts [Doc. # 86-2] ¶ 94; Pl. Stmt. of Facts [Doc. # 88] ¶ 94 ("Admit").  When a test is "administered and scored in the same manner for all applicants," plaintiffs cannot make out a claim that the examination was applied in a discriminatory manner."  <u>Hayden</u>, 180 F.3d at 50.

In addition to a lack of evidence of any discriminatory purpose, intent, or application of the examination, scoring, or ranking thereof, there is significant record evidence concerning the efforts defendants made to ensure race-neutral rankings.  As detailed above, precautions were taken in the development, administration, and scoring of the oral examinations to ensure that panelists who could observe an applicant's race did not know

---

[3] Plaintiffs' concession is further bolstered by the fact that there were many minority applicants high on the hiring list, above the four minority felons, and thus the granting of the felons' appeals hardly seems probative of any racial bias. Further, none of the minority felons were ever actually hired. See Jacobs Aff. [Doc. # 86-2, Ex. J] ¶ 4.

the point value of the answers given, and that Dr. Outtz, who conducted the scoring, did not know the racial appearance or classification of the applicants.  The panelists themselves were a diverse group with a majority of Caucasian members. Additionally, when Colligan reviewed the examination results, he expressed concern about the anomalies he perceived and both the police department and Dr. Outtz investigated the matter, resulting in affirmation of the test results.  Moreover, Colligan enforced the no-convicted-felon policy against four minority applicants, whose disqualifications were only reversed by the Civil Service Commission after a finding that those individuals had rehabilitated themselves.  There is no evidence (such as transcripts of the appeals refuting rehabilitation or of appeals by non-minority felon applicants denied) to suggest that this was not the real reason for the success of the appeals.[4]

--------

[4] Plaintiffs' disputes about the time period for which the current firefighter employee list remains "in force" also do not support their claims.  Colligan offers a legitimate reason for his interpretation that the lists do not become active until any appeals are resolved and plaintiffs have submitted no evidence refuting the reasonableness of his interpretation.  While plaintiffs contend that there is nothing in the Civil Service Rules to support Colligan's interpretation, see Pl. Opp. at 7, there is similarly nothing contradicting his view – the Rules are silent on this issue.  Additionally, Colligan testified that his interpretation is consistent with the City's practice since the late 1980s.  Colligan Dep. at 53-57.  Moreover, regardless of when the list was treated as coming into effect, hirings may be made off of that list for two years only, regardless of the beginning and end point of that two-year period.  Accordingly, no inference of discriminatory purpose can be drawn from Colligan's decision to treat the list as coming into effect only when the

Thus, there is simply no evidence of discriminatory motivation or intent in the way the oral examination or final employee list was generated or applied – in fact, there is evidence to suggest that defendants were scrupulous in avoiding any such taint – and proof of such "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." <u>Arlington Heights</u>, 429 U.S. at 265.[5]

## IV.   Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 86] is GRANTED.  The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 28th day of December, 2006.**

---

appeals were concluded, as the minorities who dominated the top of that list would be prioritized for two years only in any event.

[5] In light of the Court's conclusion, it need not address defendants' arguments as to individual defendants' liability based on claimed lack of involvement in the relevant events (<u>see</u>, <u>e.g.</u>, Def. Br. in Support of Motion [Doc. # 86-2] at 28-38).

25